[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio Pub. Works Comm. v. Barnesville*, Slip Opinion No. 2022-Ohio-4603.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4603

OHIO PUBLIC WORKS COMMISSION, APPELLEE, *v*. THE VILLAGE OF

BARNESVILLE ET AL., APPELLANTS; ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio Pub. Works Comm. v. Barnesville*, Slip Opinion No. 2022-Ohio-4603.]**

*Property law—Conveyance of oil and gas interests—Ohio Public Works Commission and Clean Ohio Conservation Fund, R.C. 164.20 et seq.—Deed restrictions on use and transfer—Remedies available at law and in equity—Use and development restrictions in deed apply to both the surface and subsurface of the properties—Court of appeals' judgment affirmed.*

(No. 2020-1129—Submitted September 21, 2021—Decided December 22, 2022.)

APPEAL from the Court of Appeals for Belmont County,

No. 19BE0011, 2020-Ohio-4034.

_____

**STEWART, J.**

{¶ 1} In this case, the Seventh District Court of Appeals held that use and development and alienation restrictions in a deed apply to both the surface and subsurface of the properties at issue and that appellant the village of Barnesville violated those restrictions when it transferred oil and gas rights to another entity, which later leased those rights to appellant Gulfport Energy Corporation ("Gulfport"), without obtaining written permission from appellee, Ohio Public Works Commission ("OPWC"). Gulfport and the village appealed. We agree with the Seventh District and affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. Clean Ohio Conservation Fund

{¶ 2} In 2000, Ohio voters passed a constitutional amendment authorizing the state to issue bonds to pay for environmental conservation and revitalization projects. *See* Ohio Constitution, Article VIII, Section 2o. Subsequently, the General Assembly created the Clean Ohio Conservation Fund (the "fund") and enacted several provisions to implement the constitutional amendment. *See* Am.Sub.H.B. No. 3, 149 Ohio Laws, Part III, 5942, 5984-5995; R.C. Chapter 164. OPWC is charged with administering the fund. R.C. 164.27(A). Political subdivisions and nonprofit organizations may apply for grants to fund projects that, inter alia, "[p]rovide for open space acquisition, including the acquisition of easements, or the related improvement of open spaces * * * for parks, forests, wetlands, natural areas that protect an endangered plant or animal population, other natural areas, and connecting corridors for natural areas," R.C. 164.22(A); *see* R.C. 167.27(A). Ohio voters reauthorized the fund in 2008. *See* Ohio Secretary of State Frank LaRose, November 4, 2008 Election Results, https://www.sos.state.oh.us/elections/election-results-and-data/2008-election-results/state-issue-2-november-4-2008/ (accessed Nov. 10, 2022) [https://perma.cc/Z78H-KW7Z].

{¶ 3} In 2002, the village applied for two grants to partially fund the purchase of land in Belmont County. The first grant involved a request for $150,000 to purchase 92.1194 acres of land adjacent to the Slope Creek Reservoir as an "open space" project, which the village proposed would provide more public access, connect corridors around the reservoir, and preserve wetlands, natural areas, and natural habitat (the "reservoir project"). The village explained that Slope Creek Reservoir "accounts for 750 million gallons of raw water" and that the reservoir's integrity is "critical to the village water customers." The second grant involved a request for $38,850 to purchase 12 acres of land adjacent to the Barnesville #1 Reservoir as an "open space" project for the purpose of, inter alia, preserving water quality and wetlands (the "wetlands project"). The village explained that the purchase of this land would allow it to "control all watershed area around [the] reservoir." OPWC approved both of the village's grant applications.

{¶ 4} OPWC and the village entered into project grant agreements for both projects. Pursuant to these agreements, the village was required to include deed restrictions in the property deeds or other instruments conveying the land. The village agreed that the deed restrictions would be "perpetual" and would not be "amended, released, extinguished or otherwise modified without the prior written approval" of OPWC. The village purchased the properties in 2003, memorializing the transfers in general warranty deeds containing the required deed restrictions.[1] The relevant deed restrictions are as follows:

> 1. Use and Development Restrictions. Declarant hereby
> agrees, for itself and its successors and assigns as owners of the
> Property, that the property shall be subject to the following: The

---

1. The village originally recorded a deed for the reservoir project that did not contain the required deed restrictions. It later filed a corrected deed that contained the required deed restrictions.

Property shall only be used for open space with trails, and for passive recreational appurtenances.

2. Perpetual Restrictions. The restrictions set forth in this Declaration shall be perpetual and shall run with the land for the benefit of, and shall be enforceable by, OPWC. This Declaration and the covenants and restrictions set forth herein shall not be amended, released, extinguished or otherwise modified without the prior written consent of OPWC, which consent may be withheld in its sole and absolute discretion.

3. Enforcement. If Declarant, or its successors or assigns as owner of the Property, should fail to observe the covenants and restrictions set forth herein, the Declarant or its successors or assigns, as the case may be, shall pay to OPWC upon demand, as liquidated damages, an amount equal to the greater of (a) two hundred percent (200%) of the amount of the grant received by Declarant, together with interest accruing at the rate of six percent (6%) per annum from the date of Declarant's receipt of the grant, or (b) two hundred percent (200%) of the fair market value of the Property as of the date of demand by OPWC. Declarant acknowledges that such sum is not intended as, and shall not be deemed, a penalty, but is intended to compensate for damages suffered in the event a breach or violation of the covenants and restrictions set forth herein, the determination of which is not readily ascertainable. OPWC shall have the right to enforce, by any proceedings at law or in equity, all restrictions, conditions and covenants set forth herein. Failure by OPWC to proceed with such enforcement shall in no event be deemed a waiver of the right to

4

enforce at a later date the original violation or a subsequent violation.

　　　　4. Restriction on Transfer of the Property. Declarant acknowledges that the grant is specific to Declarant and that OPWC's approval of Declarant's application for the grant was made in reliance on Declarant's continued ownership and control of the Property. Accordingly, Declarant shall not voluntarily or involuntarily sell, assign, transfer, lease, exchange, convey or otherwise encumber the Property without the prior written consent of OPWC, which consent may be withheld in its sole and absolute discretion.

(Underlining sic.) After the village purchased the land, it requested and received reimbursement from OPWC.

### B. Oil and gas lease, water lease, and electric-line easement

{¶ 5} In 2012, without obtaining OPWC's consent, the village entered into an oil and gas lease with Antero Resources Appalachian Corporation ("Antero"),[2] in which the village leased to Antero the rights to "oil, gas and other liquid hydrocarbons, insofar and only insofar as to the depths and formations below the base of the Ohio Shale formation (top of the Java formation) at a depth of approximately 4195 feet * * * to a depth of two hundred feet (200') below the base of the Utica (Point Pleasant) Shale in, on and under" 1,047.5047 acres of land identified in the lease. The oil and gas lease with Antero included the reservoir-project and wetland-project properties.

---

2. Antero originally filed a notice of appeal in this case. It later filed an application to be dismissed from the case, which this court granted. Therefore, Antero is no longer a party to this appeal.

{¶ 6} In 2014, also without obtaining OPWC's consent, the village entered into a "water lease" with Antero that included two parcels of land that were part of the reservoir-project property. The water lease gave Antero the right to withdraw 1.5 million gallons of water per day from Slope Creek Reservoir. The water lease also gave Antero an "easement and right-of-way on and across the Premises to construct and maintain a 'Water System' consisting of a temporary staging area(s) with a temporary access road(s) for [Antero's] exclusive use, and an easement and the right to lay above or below ground water line(s), set pump(s) and other equipment as needed for the withdrawal of water from the Reservoir." The water lease expired in January 2019.

{¶ 7} In 2014, Antero assigned its interest and rights under the oil and gas lease for the reservoir-project property to Gulfport, and in 2015, Antero assigned its interest and rights under the oil and gas lease for the wetlands-project property to Eclipse Resources I, L.P. ("Eclipse").

{¶ 8} Also in 2014, the village granted, again without OPWC's consent, an electric-line right-of-way easement" to South Central Power Company ("South Central"); OPWC alleges that this easement affected the reservoir-project property. The right-of-way easement gave South Central the right, inter alia, "to construct, reconstruct, re-phase, relocate, install, inspect, upgrade, repair, extend, operate and maintain on, over, across, under, and through * * * electric transmission and/or distribution lines or systems; to make such excavation as may be reasonably necessary to carry out the foregoing * * * ; to cut, trim, remove and control growth of trees, shrubbery, and vegetation within such right-of-way."

## C. Trial-court proceedings

{¶ 9} In April 2018, OPWC brought an action against the village, Antero, Gulfport, Eclipse, and South Central.[3] OPWC sought an injunction (or another equitable remedy) permanently enjoining the village, Antero, Gulfport, Eclipse, and South Central from violating the deed restrictions, ordering the defendants to cease all activity on the subject properties that violate the deed restrictions, ordering any entity or individual holding any kind of interest in the properties to assign their interests back to the village, and ordering the merger of surface and mineral rights on the properties. OPWC further sought a declaratory judgment against the village, Antero, Gulfport, Eclipse, and South Central voiding all transfers of interest (leases, easements, and encumbrances) on the properties and declaring that the surface and mineral rights of the properties merge and that the village breached the deed restrictions when it transferred its interests in the subject properties. Finally, OPWC sought money damages against the village, Antero, Gulfport, and Eclipse.

{¶ 10} The parties filed multiple motions. Gulfport and OPWC moved for judgment on the pleadings. The village filed a motion for summary judgment, and Antero filed a motion for summary judgment and "joinder in co-defendant Gulfport's motion for judgment on the pleadings."

{¶ 11} The trial court denied OPWC's motion for judgment on the pleadings and granted Gulfport's motion for judgment on the pleadings and the village's and Antero's motions for summary judgment. The court concluded that (1) "because open space is not underground," the use and alienation restrictions "apply solely to the surface of the Premises and not to the subsurface estate," (2) OPWC "has no basis to obtain either injunctive relief or declaratory relief"

---

3. After OPWC filed its complaint in this case, Eclipse released all rights, title, and interest to the wetlands-project property. The trial court subsequently issued an agreed judgment entry in July 2018 dismissing Eclipse from the case. In January 2019, OPWC also voluntarily dismissed South Central from the case without prejudice.

regarding the Water Lease because it expired in January 2019, (3) monetary damages "would be the sole and exclusive remedy available to [OPWC] for any alleged breach" of the use and alienation restrictions and therefore, OPWC's claims seeking injunctive and declaratory relief should be dismissed, and (4) OPWC failed to submit sufficient evidence to create an issue of material fact to establish that the defendants "made use of the surface of the Premises pursuant to either the Oil & Gas Lease or the Water Lease, and, even if there had been surface use, that [OPWC] was damaged by such use."  Belmont C.P. No. 18 CV 144, 2019 WL 11025466, *3-4 (Mar. 29, 2019).  Finally, the trial court also concluded that

> the alienability of the subsurface (whether by lease, deed, mortgage, or otherwise) has no impact on the open space on the Premises. There is no conflict between the use of the subsurface and open space on the surface of the Premises.  Therefore, this court concludes that the Alienation Restriction does not apply to the subsurface.  As a result, any transfer of the subsurface estate (including the Oil and Gas Lease) does not violate the Alienation Restriction.

*Id.* at *4.

{¶ 12} OPWC appealed to the Seventh District Court of Appeals.

### D.  Court of appeals' decision

{¶ 13} In a two-to-one decision, the Seventh District affirmed the trial court's judgment in part, reversed it in part, and remanded the case to the trial court. 2020-Ohio-4034, ¶ 51.  First, the Seventh District held that the trial court erred when it granted Gulfport's motion for judgment on the pleadings.  *Id*. at ¶ 30.  The appellate court then held that the trial court's judgment denying OPWC's motion for judgment on the pleadings was proper.  *Id*. at ¶ 31.

8

**{¶ 14}** In so holding, the Seventh District relied heavily on its previous decision in *Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, 2019-Ohio-4916, 137 N.E.3d 144 (7th Dist.), which, the court of appeals stated, "involved very similar facts," 2020-Ohio-4034 at ¶ 33, and very similar deed restrictions, *id*. at ¶ 34. The appellate court held that the use and development restrictions and alienation restriction applied to both the surface and subsurface and that OPWC could obtain monetary damages and equitable relief as remedies for a breach of the deed restrictions.

**{¶ 15}** Gulfport, Antero, and the village timely appealed, and this court accepted jurisdiction of the case.[4] *See* 160 Ohio St.3d 1459, 2020-Ohio-5332, 157 N.E.3d 786. We accepted three propositions of law:

1. An absolute prohibition on the transfer of interests in a Clean Ohio grant-funded property, subject only to the sole and unlimited discretion of the Commission, is void as against Ohio public policy.

2. Deed restrictions, which are contractually enforceable by an award of liquidated damages that include rescission of the grant itself, cannot be enforced by injunction.

3. Mere transfers of interests in the development of deep minerals beneath real property do not violate a deed restriction that permits the use of the property only as an "open space."

*See id.*[5]

---

4. As previously stated, Antero's appeal has been dismissed.

5. The propositions of law quoted here are Gulfport's. The village raised four propositions of law but we accepted only the first three, which are essentially the same as Gulfport's three propositions of law.

## II. LAW AND ANALYSIS

### A. *Siltstone Resources v. Ohio Pub. Works Comm., L.L.C.*

{¶ 16} As previously noted, the Seventh District relied heavily on its prior decision in *Siltstone*, 2019-Ohio-4916, 137 N.E.3d 144. This court recently affirmed that judgment in *Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, _ Ohio St.3d. _, 2022-Ohio-483, _ N.E.3d _. A thorough review of these decisions is necessary.

{¶ 17} In *Siltstone*, OPWC had approved a $430,200 grant from the Clean Ohio Conservation Fund to the Guernsey County Community Development Corporation ("Guernsey") for the purpose of purchasing a 228.45 acre tract of land. 2019-Ohio-4916, 137 N.E.3d 144, at ¶ 4-6. Per the terms of the grant, Guernsey was required to record several restrictions in the deed to the property. *Id*. at ¶ 6-7. All but the use and development restrictions were nearly identical to the restrictions in the current case and thus will not be repeated here. The use and development restrictions in *Siltstone* stated:

> Declarant hereby agrees, for itself and its successors and assigns as owners of the Property, which Property shall be subject to the following: This property will not be developed in any manner that conflicts with the use of the Premises as a green space park area that protects the historical significance of this particular parcel. Only current structures will be maintained and no new structures will be built on the premises.

*Id.* at ¶ 7.

{¶ 18} Guernsey subsequently leased the property's oil and gas rights and sold mineral rights to third parties without OPWC's written permission. *Id*. at ¶ 9-12. Siltstone Resources, Inc. ("Siltstone"), which purchased mineral rights to

approximately 187 acres from Guernsey, filed an action against OPWC, Guernsey, and Gulfport, seeking a declaration that Guernsey did not violate the deed restrictions when it signed the oil and gas lease and seeking "to quiet title to the mineral[ rights] it had purchased from" Guernsey. *Id*. at ¶ 15-16. Siltstone additionally argued that OPWC could recover only monetary damages if the court determined that any of the defendants were liable. *Id*. at ¶ 16.

{¶ 19} OPWC filed counterclaims and cross-claims, seeking declaratory and injunctive relief. *Id*. at ¶ 17. OPWC requested "an injunction restraining all parties from violating the deed restrictions" and "that the interest be assigned back to" Guernsey. *Id*. OPWC also sought "liquidated damages as set forth in the deed." *Id*.

{¶ 20} The trial court determined that OPWC could obtain only monetary relief because R.C. 164.26(A) did not give it the right to equitable relief. 2019-Ohio-4916, 137 N.E.3d 144, at ¶ 18. The trial court further determined that "the Use and Development Restriction was unambiguous and did not apply to the subsurface because green space is not underground." *Id.* at ¶ 19. And it found that "the Restrictions on transfer of the Property constituted an illegal, unreasonable restraint on alienability." *Id*. OPWC then appealed to the Seventh District.

{¶ 21} The Seventh District agreed with the trial court that the use and development restrictions were clear and unambiguous and applied only to the surface because the restrictions prohibited only actions that interfered with the property's being used for a "green space park area," which the appellate court determined did not include the subsurface. *Id*. at ¶ 42-46. Therefore, the appellate court held that the oil and gas lease and mineral-rights sale did not violate the use and development restrictions. *Id*. at ¶ 46.

{¶ 22} However, the Seventh District disagreed with the trial court's determination that the alienation restriction, i.e., the restriction on the transfer of the property, applied only to the surface of the property. *Siltstone*, 2019-Ohio-

4916, 137 N.E.3d 144, at ¶ 51. The appellate court concluded that because Guernsey did not obtain OPWC's consent prior to any of the transactions, Guernsey violated the deed's restrictions on the transfer of property. *Id*. at ¶ 50. It reasoned that in the alienation restriction, there was "no reference to 'green space park area' to modify 'property' " as there was in the use and development restrictions. *Id*. at ¶ 51.

{¶ 23} Finally, the Seventh District reversed the trial court's judgment with respect to possible remedies that OPWC could obtain. The appellate court explained that "nothing in R.C. 164.26(A) prevents equitable relief." *Siltstone* at ¶ 66. The court further stated, "the Enforcement Restriction clearly and unambiguously provides that * * * OPWC has the right to enforce the deed restrictions in equity." *Id*. at ¶ 68.

{¶ 24} Siltstone (and two other companies involved in the lower-court case) appealed to this court, and we accepted jurisdiction of the case.[6] *See* 158 Ohio St.3d 1443, 2020-Ohio-1032, 141 N.E.3d 969. Siltstone challenged the court of appeals' holding that the alienation restriction applied to both the surface and subsurface of the properties and that OPWC could obtain equitable as well as monetary relief.

{¶ 25} This court affirmed the Seventh District. *Siltstone*, _ Ohio St.3d _, 2022-Ohio-483, _ N.E.3d _, ¶ 48. We held that the transfer restriction in the deed applied to the surface and subsurface of the property and that Guernsey "violated the restriction when it leased and transferred the mineral rights." *Id.* at ¶ 35. We further held, "[T]he language and authority in R.C. 164.26 is clear and does not forbid OPWC from seeking remedies at law and in equity, as is provided for in the agreement between [Guernsey] and OPWC." *Id*. at ¶ 47.

---

6. In *Siltstone*, _ Ohio St.3d _, 2022-Ohio-483, _ N.E.3d _, Guernsey and Gulfport (and two additional companies that were parties in the lower courts) filed amicus briefs with this court in support of Siltstone, but they were not parties to the appeal.

## B. Alienation restriction and remedies

{¶ 26} Gulfport's and the village's first two propositions of law as well as the arguments they make in support of these propositions are similar to Siltstone's arguments and propositions of law in *Siltstone*, _ Ohio St.3d _, 2022-Ohio-483, _ N.E.3d _. Therefore, this court's decision in *Siltstone* answers the questions presented in Gulfport's and the village's first two propositions of law.

{¶ 27} In support of its first proposition of law, Gulfport argues that "Ohio public policy highly disfavors restraints on the alienability of real property and encourages and promotes the responsible development of oil and gas resources throughout the state." The village similarly argues in support of its first proposition of law that "Ohio has a clear public policy against restraints on the alienation of real property" and that "Ohio also has a clear public policy favoring the responsible development of oil and gas resources on public as well as private lands." In *Siltstone*, we explained:

> The general rule may favor alienability, but no rule, statute, or other authority supports a complete ban on transfer restrictions. 61 American Jurisprudence 2d, Perpetuities and Restraints on Alienation, Sections 90-91 (2021). The transfer restriction in this case is sufficiently supported by the public-policy purpose authorized by the Ohio Constitution in Article VIII, Section 3, and moreover, was contracted for by the parties for that specific public purpose.

*Id.* at ¶ 34. We further recognized Ohio's public policy favoring "oil and gas production in a manner consistent with the health, safety, and welfare of the citizens of Ohio" but declined to find that deed restrictions impeded or violated that public policy. *Id.* at ¶ 33, citing *Newbury Twp. Bd. of Trustees v. Lomak Petroleum, Inc.*,

62 Ohio St.3d 387, 583 N.E.2d 302 (1992). Notably, in *Siltstone*, it was Gulfport and other amici who argued that the "deed restrictions violate[d] public policy in so far as they impede[d] oil and gas development," citing *Newbury* in support of their argument. *Id.* But we distinguished *Newbury* in *Siltstone*, explaining that *Newbury* involved a local zoning ordinance that regulated oil and gas exploration and that the ordinance was preempted by former R.C. 1509.39. *Id.*, citing *Newbury* at 389-392.

{¶ 28} In their second propositions of law, Gulfport and the village argue that OPWC was not entitled to equitable relief. In *Siltstone*, however, we affirmed the Seventh District and agreed with OPWC that "nothing in R.C. 164.26 limits [OPWC's] remedies exclusively to liquidated damages and that to do so would run counter to the purpose of the Clean Ohio Fund program, essentially allowing disingenuous recipients to 'buy their way out' of long-term stewardship." _ Ohio St.3d _, 2022-Ohio-483, _ N.E.3d _, at ¶ 42-43.

{¶ 29} Based on our decision in *Siltstone*, we find no merit to Gulfport's and the village's arguments set forth in their first and second propositions of law.

## C. Use restriction

{¶ 30} In their third propositions of law, Gulfport and the village maintain that the Seventh District erred when it held that the village violated the use and development restrictions in the deeds when it entered into the lease transferring oil and gas rights without obtaining OPWC's consent. Gulfport and the village argue that transfers of interests in property that involve only the development of minerals do not violate deed restrictions that limit surface activity on the property. They further argue that entering into the lease alone cannot be a breach of the use restriction in the deeds because the deed restrictions forbid only actual uses of the properties, not possible uses. Or as Gulfport phrases it, "a paper transaction in the right to develop the minerals thousands of feet beneath a property is not, itself, a

'use' of that property—let alone of its 'open space'—by any 'common, ordinary meaning' of those terms."

{¶ 31} We first note that our decision in *Siltstone* is not helpful in determining this issue because no party appealed the Seventh District's holding regarding the use and development restrictions in that case. Therefore, we must turn to the language of the deeds. The use and development restrictions in this case state in pertinent part that "[t]he Property shall only be used for open space with trails, and for passive recreational appurtenances."

{¶ 32} The construction of instruments of conveyance is a matter of law that is subject to de novo review. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). When interpreting a deed, the primary goal of this court is to look to the terms of the deed to give effect to the intentions of the parties. *See Koprivec v. Rails-to-Trails of Wayne Cty.*, 153 Ohio St.3d 137, 2018-Ohio-465, 102 N.E.3d 444, ¶ 23. The best way to do that is to look at the words found within the four corners of the deed itself and to adhere to the plain language used there. *See id.* at ¶ 29.

{¶ 33} Looking at the relevant language of the deeds here, we conclude that the Seventh District correctly determined that the village violated the use and development restrictions when it leased the oil and gas rights to Antero without obtaining OPWC's consent. As we stated in *Browne v. Artex Oil Co.*, 158 Ohio St.3d 398, 2019-Ohio-4809, 144 N.E.3d 378, ¶ 23:

> In describing the property interest created by an oil and gas lease, we have acknowledged that the lease affects the possession and custody of both the mineral and surface estates. [*Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185,] ¶ 60. During the term of the lease, "the lessor effectively relinquishes his or her ownership interest in the oil and

gas underlying the property in favor of the lessee's exclusive right to those resources." *Id*. at ¶ 62. The lessee also enjoys reasonable use of the surface estate to accomplish the purposes of the lease. *Id*. at ¶ 60.

**{¶ 34}** Therefore, by transferring oil and gas rights to Antero (who later assigned them to Gulfport) without obtaining OPWC's prior consent, the village violated the use and development restrictions in the deeds. Gulfport obtained oil and gas rights to the property, which meant that it also obtained the right to use the surface of the property to gain access to the oil and gas below the surface of the property. This is in direct contradiction to the use and development restrictions in the deeds that plainly prohibited any use of the property that did not involve "open space with trails" and "passive recreational appurtenances."

**{¶ 35}** To the extent that Gulfport and the village argue that there was no breach in this case because the property had yet to be disturbed in any way, neither the surface nor the subsurface, we find no merit to that argument. Antero and later Gulfport obtained a real-property interest when the transfer of oil and gas rights was complete. *See Browne* at ¶ 22, citing *Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 42-43, 49; Keeling & Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 St. Mary's L.J. 1, 6-7 (2005); R.C. 5301.09, 2014 Sub.H.B. No. 9 (effective Mar. 23, 2015) (recognizing that oil and gas leases "create an interest in real estate"). Therefore, the fact that Gulfport had yet to disturb the property in any way is of no consequence.

**{¶ 36}** Accordingly, we conclude that the Seventh District correctly determined that the village violated the use and development restrictions when it transferred oil and gas rights without OPWC's written consent, because the use and development restrictions apply to both the surface and subsurface of the properties.

16

### III. CONCLUSION

{¶ 37} The village requested grant funding from OPWC; if the village "did not wish to abide by the terms of the grant and thereby the deed restrictions for the property purchased with grant funding, it could have sought funding for [these projects] elsewhere," *Siltstone*, _ Ohio St.3d. _, 2022-Ohio-483, _ N.E.3d _, at ¶ 32. But when it agreed to accept the funding and include the required deed restrictions in the deeds, it was bound by the restrictions. Accordingly, we affirm the judgment of the Seventh District Court of Appeals.

Judgment affirmed.

O'CONNOR, C.J., and DONNELLY and BRUNNER, JJ., concur.

KENNEDY, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion joined by FISCHER, J.

_____

**KENNEDY, J., dissenting.**

{¶ 38} Appellant the village of Barnesville received grants of $38,850 and $150,000 from the Clean Ohio Conservation Fund to finance the purchase of two properties for conservation projects to protect land around village reservoirs and to preserve wetlands. Appellee, Ohio Public Works Commission, asserts that the village violated transfer and use restrictions in the deeds for the two properties that were the subject of the grant agreements between the village and the commission. Because the transfer restrictions in this case use the same language as the transfer restriction in *Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, __ Ohio St.3d __, 2022-Ohio-483, __ N.E.3d __, I would hold that the transfer-restriction provisions in this case are void as unreasonable restraints on alienation. *See Siltstone* at ¶ 53 (DeWine, J., dissenting).

{¶ 39} Unlike in *Siltstone*, *id.* at ¶ 59 (DeWine, J., dissenting), the issue of the effect of the use restrictions in this case is properly before this court, and the court should hold that the village did not violate them under the record before us.

Therefore, I would reverse the judgment of the court of appeals. Because the majority does otherwise, I dissent.

*Propositions of Law*

{¶ 40} This court accepted the following propositions of law:

> 1. An absolute prohibition on the transfer of interests in a Clean Ohio grant-funded property, subject only to the sole and unlimited discretion of the Commission, is void as against Ohio public policy.
>
> 2. Deed restrictions, which are contractually enforceable by an award of liquidated damages that include rescission of the grant itself, cannot be enforced by injunction.
>
> 3. Mere transfers of interests in the development of deep minerals beneath real property do not violate a deed restriction that permits the use of the property only as an "open space."

*See* 160 Ohio St.3d 1459, 2020-Ohio-5332, 157 N.E.3d 786.

{¶ 41} In regard to the first proposition of law, as stated above, I would hold that the absolute prohibition of the transfer of an interest in a Clean Ohio grant-funded property is void as against Ohio property law. The third proposition of law raises the issue of the use restrictions in the deeds. Because of my resolution of the third proposition of law, it is unnecessary to resolve the second proposition of law.

*The Use Restriction*

{¶ 42} "The general rule, with respect to construing agreements restricting the use of real estate, is that such agreements are strictly construed against limitations upon such use, and that all doubts should be resolved against a possible construction thereof which would increase the restriction upon the use of such real

estate." *Bove v. Giebel*, 169 Ohio St. 325, 159 N.E.2d 425 (1959), paragraph one of the syllabus.

**{¶ 43}** The key portion of the use restriction in the deeds in this case reads:

> 1. <u>Use and Development Restrictions</u>. Declarant hereby agrees, for itself and its successors and assigns as owners of the Property, that the property shall be subject to the following: The Property shall only be used for open space with trails, and for passive recreational appurtenances.

**{¶ 44}** Appellants, the village and Gulfport Energy Corporation ("Gulfport"), assert that the mere transfer of interests in the development of deep minerals beneath real property does not violate a deed restriction that permits the use of the property only as an "open space." The majority disagrees.

**{¶ 45}** The majority finds no merit to the appellants' argument that because the property had yet to be disturbed in any way, on either the surface or the subsurface, there was no breach in this case. The majority holds that the leasing of oil and gas rights violates the use restriction. Here, Antero Resources Appalachian Corporation originally signed an oil and gas lease with the village. Antero assigned its rights to Gulfport. According to the majority, the use restriction was violated upon the grant of leasing rights to Antero. In my view, however, an oil and gas lease, in and of itself, does not transfer an interest in real property:

> [A]n oil and gas lease "does not vest in [the lessee] the title to the oil and gas in said land, and is not a grant of any estate therein, but is simply a grant of a right to prospect for oil and gas, no title vesting until such substances are reduced to possession by extracting same

from the earth—an incorporeal hereditament." *Kolachny v. Galbreath*, 1910 OK 229, 26 Okla. 772, 110 P. 902, 906.

(Brackets added in *Browne*.) *Browne v. Artex Oil Co.*, 158 Ohio St.3d 398, 2019-Ohio-4809, 144 N.E.3d 378, ¶ 72 (Kennedy, J., dissenting).

{¶ 46} An incorporeal interest affects neither the surface nor subsurface of a property. There is no property interest for the lessee until the oil and gas are extracted from the property, when the extracted material becomes personal property. *Id.* at ¶ 73. Therefore, there is no "use" of the subject property involved in simply entering into a lease agreement.

{¶ 47} The granting of an oil and gas lease therefore cannot be considered a use. And the commission should not assume that the granting of an oil and gas lease necessitates the use of the surface. Although " 'the mineral estate carries with it the right to use as much of the surface as may be reasonably necessary to reach and remove the minerals,' " *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 249, fn. 1, 313 N.E.2d 374 (1974), quoting 54 American Jurisprudence 2d 389, Mines and Minerals, Section 210, that general rule does not apply when " 'the language of the conveyance by which minerals are acquired repels such construction.' " *Id*. In this case, the use restriction would limit the implied transfer of surface-use rights usually associated with a lease. Additionally, there is no evidence that Gulfport used or attempted to use the surface to access its mineral rights.

{¶ 48} Moreover, the majority characterizes the granting of an oil and gas lease as a transfer of a property interest. If that is true, then the granting of an oil and gas lease here cannot be a violation of the *use* restriction. Rather, the granting of a lease would be a violation of the *transfer* restriction. And, as set forth above, in my view, transfer restrictions on a property interest are void as unreasonable restraints on alienation.

**{¶ 49}** Finally, in this case the use restriction applies only to the use of the surface of the property or that which could affect the use of the surface. The use restriction contemplates only that which would be visible—areas where trails or passive recreational appurtenances could be installed. The use restriction does not purport to limit activity like that contemplated by an oil and gas lease and occurring 4,000 feet underground. Nothing that occurs 4,000 feet below the surface is incompatible with having open space with trails or passive recreational appurtenances.

*Conclusion*

**{¶ 50}** Because the transfer restrictions in this case are void as unreasonable restraints on alienation and because there has been no use that violates the use restrictions in the deeds at issue, I would reverse the judgment of the court of appeals. Because the majority holds otherwise, I dissent.

—————————————

**DEWINE, J., dissenting.**

**{¶ 51}** This is the second case that this court has decided this year involving deed restrictions on a property that was purchased with a grant from the Clean Ohio fund. In the earlier case, a majority upheld a restriction on the transfer of the property that worked as an absolute restraint on the alienation of the property. *Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, _ Ohio St.3d. _, 2022-Ohio-483, _ N.E.3d _. I disagreed with the court's analysis and dissented from its judgment. *See id* at ¶ 50-106.

**{¶ 52}** In this case, we are asked to review a nearly identical deed provision that altogether prohibits the transfer of the property at issue. As in *Siltstone*, I would hold that this restriction is unreasonable and void as an absolute restraint on alienation.

**{¶ 53}** We are also asked to review a restriction on the *use* of the property that is different than the use restriction at issue in *Siltstone*. The majority concludes

that the village of Barnesville, the owner of the property, violated this use restriction when it transferred oil and gas rights to the property. I agree with the first dissenting opinion that the village did not violate the use provision in the deed merely by entering into a lease regarding the mineral rights to the property.

{¶ 54} In my view, the plain language of the deed's use restriction prohibits the use of the property for subsurface mineral extraction. But because the Ohio Public Works Commission based its claim that the village had violated the use restriction on the village's act of leasing the property rather than on any subsurface activity, I agree with the first dissenting opinion that the commission is not entitled to relief.

### The village purchases land and then leases the mineral rights

{¶ 55} In 2002, the village of Barnesville received grants from the Ohio Public Works Commission to purchase land in Belmont County. In exchange for funding, the village was required to include certain conditions in the deeds to the properties. One condition provides that the village "shall not voluntarily or involuntarily sell, assign, transfer, lease, exchange, convey or otherwise encumber the Property without the prior written consent of [the Public Works Commission], which consent may be withheld in its sole and absolute discretion." I'll refer to this as the Transfer Restriction. The deeds also contained a clause limiting the use and development of the property, which I'll call the Use Restriction. Under the Use Restriction, the village agreed, "for itself and its successors and assigns as owners of the Property," that the property "shall only be used for open space with trails, and for passive recreational appurtenances." The deeds further provided that the restrictions "shall be perpetual and shall run with the land for the benefit of, and shall be enforceable by, [the Public Works Commission]."

{¶ 56} The deeds contain language setting forth the available remedies for a breach of the deed restrictions. In such event, the village "or its successors or assigns" must pay to the Public Works Commission liquidated damages of either

22

(1) twice the amount of the grant, plus interest or (2) twice the fair market value of the property. The liquidated damages are "intended to compensate for damages suffered in the event [of] a breach or violation of the covenants and restrictions set forth herein, the determination of which is not readily ascertainable." Further, the Public Works Commission "shall have the right to enforce, by any proceedings at law or in equity, all restrictions, conditions and covenants set forth [in the deed restrictions]."

{¶ 57} The village subsequently leased the mineral rights on the grant-funded properties to other entities without the permission of the Public Works Commission. Gulfport Energy Corporation ("Gulfport") is the current holder of the oil and gas lease for one of the properties. The Public Works Commission brought this action against the village and Gulfport, as well as some other entities that are not involved in this appeal. The commission sought a judgment declaring that the village had violated the Transfer and Use Restrictions and that the leases were invalid. It also asked the court to award liquidated damages and injunctive relief.

{¶ 58} Gulfport and the Public Works Commission filed cross-motions for judgment on the pleadings, and the village filed a motion for summary judgment. The trial court decided in favor of Gulfport and the village on their motions. The court determined that both the Transfer and Use Restrictions apply to only the surface of the property; it therefore concluded that the lease of the subsurface rights did not violate either restriction.

{¶ 59} The Public Works Commission appealed, and the Seventh District Court of Appeals reversed. 2020-Ohio-4034. The court of appeals concluded that the deed restrictions applied to both the surface and subsurface of the property, and it remanded the case for further proceedings. We accepted the village's and Gulfport's appeals to address the validity and scope of the Transfer and Use Restrictions.

**The Transfer Restriction is void**

{¶ 60} The transfer restriction that was at issue in *Siltstone*, _ Ohio St.3d. _, 2022-Ohio-483, _ N.E.3d _, is identical in all meaningful respects to the one here. For the reasons expressed in my dissenting opinion in that case, the Transfer Restriction contained in the village's deeds is invalid. It is void under the common-law rule because it is an absolute restraint on alienation of a fee-simple estate, *see Siltstone* at ¶ 61-67 (DeWine, J., dissenting); Dukeminier & Krier, *Property*, 379 (1981) ("An absolute * * * restraint upon a legal fee simple is almost always held void"). The restriction is also unreasonable under the modern reasonableness approach to deed interpretation, which weighs " 'the utility of the restraint against the injurious consequences of enforcing the restraint,' " *Siltstone* at ¶ 69 (DeWine, J., dissenting), quoting 1 Restatement of the Law 3d, Property, Servitudes, Section 3.4 (2000). Here, the restraint on alienation is an onerous one: it is absolute, unlimited in time and scope, and applies to all future transferees. And the Transfer Restriction has virtually no independent utility, as "most, if not all, of the purported benefit served by the Transfer Restriction is already accomplished by the Use Restriction," *id*. at ¶ 87. For these reasons, I would hold that the Transfer Restriction is void.

**A transfer of property rights does not violate the Use Restriction**

{¶ 61} The majority determines that because Gulfport obtained the oil and gas rights to the property, there has been a violation of the use restriction—regardless of whether the property has actually been used in any way. As the first dissenting opinion correctly explains, simply entering into a lease agreement does not constitute a *use* of the property.

{¶ 62} By reaching a contrary conclusion, the majority effectively construes the Use Restriction in a manner indistinguishable from the Transfer Restriction. This construction makes little sense when applied to other scenarios. Suppose the village was unable to maintain the property as it had originally planned, so it

transferred the oil and gas rights to a conservation agency. By the majority's logic, the village would have violated the Use Restriction through the transfer of the mineral rights alone, even if the agency had every intention of preserving the property in accordance with the deed. I therefore disagree with the majority's conclusion that a partial transfer of rights violates the Use Restriction.

### The Use Restriction prohibits subsurface mining

**{¶ 63}** I part ways with the first dissenting opinion in its interpretation of the Use Restriction. The provision states that "[t]he Property shall *only* be used for open space with trails, and for passive recreational appurtenances." (Emphasis added.) The clause prohibits the use of the property for any purposes other than "for open space with trails" and "for passive recreational appurtenances." There is no language limiting the provision to the surface of the property. Nor can we read much into the provision's silence on subsurface activity. Given that the provision bans all uses *except* open space with trails and passive recreational appurtenances, there is little reason to address subsurface uses at all; they would be banned as well.

**{¶ 64}** Thus, the question whether subsurface drilling would as a practical matter interfere with the authorized uses is of no consequence under the plain language of the Use Restriction. Use of the property for mineral extraction simply does not constitute use "for open space with trails" or "for passive recreational appurtenances."

**{¶ 65}** Nevertheless, the theory advanced by the Public Works Commission in the trial court was that the village had violated the Use Restriction solely by transferring the mineral rights to the property. I agree with the first dissenting opinion that the transfer of mineral rights does not constitute a breach of the Use Restriction.

### Conclusion

**{¶ 66}** I would reverse the judgment of the Seventh District Court of Appeals and reinstate the trial court's judgment in favor of the village and Gulfport.

Because I would hold that the Transfer Restriction is void and that the Public Works Commission has not established a breach of the Use Restriction through the village's transfer of the property's mineral rights, there is no need to address the question whether the commission may pursue injunctive relief in addition to liquidated damages in the event of a breach.

FISCHER, J., concurs in the foregoing opinion.

―――――――――

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Samuel C. Peterson, Deputy Solicitor General, and Caroline Mills, Assistant Attorney General, for appellee.

Bricker & Eckler, L.L.P., Matthew W. Warnock, Aaron M. Bruggeman, Christine Rideout Schirra, and Kara H. Herrnstein, for appellant Gulfport Energy Corporation.

Graham & Graham Co., L.P.A., Robert G. McClelland, Stephen R. McCann, and Travis M. Jones; and Myser & Myser and Adam L. Myser, for appellant the village of Barnesville.

―――――――――